IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WALTER KRUPKA<br>96 Bergen Avenue<br>Jersey City, NJ 07305<br><br>              Plaintiff,<br>   v.<br><br>TF CORNERSTONE, INC.<br>387 Park Avenue South, 7th Floor<br>New York, NY 10016<br>      and<br>ROSS GABEL<br>387 Park Avenue South, 7th Floor<br>New York, NY 10016<br>      and<br>MARIO TODOROV<br>387 Park Avenue South, 7th Floor<br>New York, NY 10016<br>      and<br>AMALIO BARETO<br>387 Park Avenue South, 7th Floor<br>New York, NY 10016<br><br>              Defendants. | Docket No.:<br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

### INTRODUCTION

1. This action has been initiated by Walter Krupka (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) against TF Cornerstone, Inc. and three individuals outlined below (*hereinafter* collectively referred to as "Defendants," unless indicated otherwise) for violations of Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 2000e, *et. seq.*), the New York State Human Rights Law ("HRL" - N.Y. Exec. Law §§ 290 *et. seq.*), the New York Labor Law, the New York City Human Rights Law, N.Y.C. Admin. Code ("NYCHRL") and the

Americans with Disabilities Act ("ADA"). As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. Any state or city claims herein or included would be proper under this Court's ancillary or supplemental jurisdiction to hear state and city claims arising out of the same common nucleus of operative facts as those set forth in Plaintiff's federal claims. There would alternatively be complete diversity for jurisdiction under 28 U.S.C. § 1332.

3. This Court may properly maintain personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this District because actions underlying this case occurred in this District and Defendants are deemed to reside where they are subject to personal jurisdiction, rendering Defendants herein as well.

## PARTIES

5. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6. Plaintiff is an adult male residing at the above-captioned address.

7. TF Cornerstone, Inc. (hereinafter "Defendant Cornerstone") acquires, develops, constructs, and manages residential, commercial, and retail properties. It is a for-profit entity with many locations throughout New York, but primarily operating from the above-captioned location.

8. Ross Gabel (hereinafter "Defendant Gabel") was at all relevant times the Property Manager of the building wherein Plaintiff was primarily employed, located at 606 West 57th Street, New York, NY 10019.

9. Mario Todorov (hereinafter "Defendant Todorov") was at all relevant times the Building Manager of the building wherein Plaintiff was primarily employed, located at 606 West 57th Street, New York, NY 10019.

10. Amalio Barreto (hereinafter "Defendant Barreto") was at all relevant times the Assistant Property Manager of the building wherein Plaintiff was primarily employed, located at 606 West 57th Street, New York, NY 10019.

11. At all times relevant herein, Defendants acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## FACTUAL BACKGROUND

12. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

13. Plaintiff was hired by Defendant Cornerstone effective on or about February 12, 2018; and in total, he was employed for approximately 6 months (until involuntary termination, as outlined *infra*).

14. Plaintiff worked for Defendant Cornerstone as a Porter, Painter, and general laborer during his approximate 6-month tenure. Plaintiff painted, performed trash removal, cleaned, did maintenance, and a host of other labor-intensive or project-based work.

15. From hire and through most of Plaintiff's tenure with Defendant Cornerstone, Plaintiff was physically placed to work within its location at 606 West 57th Street, New York, NY 10019. This building complex is known as "The Max."

16. The reporting structure of Plaintiff's management was as follows:

    (a) Plaintiff directly reported to Defendant Todorov, a Building Manager;

    (b) Plaintiff indirectly reported to Defendant Barreto, an Assistant Property Manager who oversaw Defendant Todorov; and

    (c) Plaintiff indirectly reported to Defendant Gavel, a Property Manager who oversaw Defendants Todorov and Barreto.

    **(A) Prior to complaining of sexual harassment and engaging in other legally-protected activities, Plaintiff was not counseled or disciplined.**

17. From hire in February through August of 2018 (a period of approximately 5.5 months), Plaintiff did not receive any discipline.

18. Plaintiff was generally recognized as a hard worker who completed tasks assigned and/or within the scope of his job duties as expected.

19. Plaintiff was however, as discussed *infra*, promptly terminated shortly after making complaints of sexual harassment and for engaging in other legally-protected activities (which Defendants have admitted in writing).

    **(B) Plaintiff engaged in statutorily "protected activities" under state and federal law(s) to which Defendants have, *in writing*, admitted to terminating him for engaging.**

20. Via e-mail, dated July 17, 2018, Plaintiff complained to Lisa Wahl (Vice President of Human Resource), that he was "sexually assaulted by Handyman Alberto [Quiles]." In

4

particular, Plaintiff complained that: (a) while Plaintiff was bent over, "Alberto stood behind [him] placing his crotch on [his] rear end" and "began gyrating his hips as if he was having sex with [him];" (b) "Alberto has repeatedly touched [his] chest, squeezed [his] breast, and pinched [his] nipple];" and (c) that Alberto said "on numerous occasions" to him that his "eyes are bedroom eyes and he would love to see [him] in the bedroom with him." Plaintiff further outlined in this July 17, 2018 e-mail other concerns of intimidation when he attempted to express concerns of other harassment as well.

21. Plaintiff's complaint to Wahl not only commonsensically known as "sexual harassment," it was also: (a) defined as "Sexual harassment" within Defendant Cornerstone's own handbook under the bullet point "Unwelcome sexual advance or conduct;" and (b) and made *to the exact person* Plaintiff was directed to complain to within Defendant Cornerstone's own employment policies (suggesting reporting to "the Vice President of Human Resources).

22. Several days after reporting sexual harassment and intimidation, Plaintiff required a medical leave of absence from on or about July 20, 2018 through on or about August 7, 2018 (a period of approximately 2 weeks). Plaintiff provided Defendant Cornerstone with medical documentation to support his hospitalization and medical treatment during this approximate 2-week medical leave of absence. Plaintiff suffers from serious health complications at times, including but not limited to Diabetes.

23. ***During*** Plaintiff's medical leave, by letter dated July 31, 2018 (from Defendant Gabel), Plaintiff was threatened with employment consequences for him allegedly "violating policies." Defendants made no effort to engage in a meaningful interactive dialogue with Plaintiff during his absence, despite Plaintiff being hospitalized and requiring serious medical treatment.

The threats of employment consequences by Gabel were due to Plaintiff being on a short medical leave.

24. As of mid-August 2018, Plaintiff had reiterated concerns of his past sexual harassment experience; and further, that: (a) another employee was called a "fucking Jew" (amongst other religious / ethnic slurs) which offended Plaintiff (also Jewish) (b) Plaintiff was being taunted by some coworkers as a result of being vocal for sexual harassment concerns; (d) he smelled chemicals in his water bottle on multiple occasions; and (e) Plaintiff was experiencing other forms of subtle or not-so-subtle mistreatment.

25. Plaintiff's concerns were very legitimate, as Defendants' management hired and retained dozens of laborers who were graphic, undereducated, used profane language, and were generally very unprofessional. Defendants' management dismissed concerns as raised by Plaintiff or others because they didn't care about employee concerns other than ensuring work was completed. Indeed, they merely threatened discipline or termination when various concerns were raised.

(C) **Plaintiff was transferred by Defendants in mid-August 2018 to a different building managed by Defendant Cornerstone, and Plaintiff worked therein without discipline or issue.**

26. By letter dated August 16, 2018, from Defendant Gabel, Plaintiff was informed that he was being transferred by to 505 West 37th Street, New York, NY 10019. This letter further confirmed: (a) Plaintiff's job would not change; (b) Plaintiff's compensation would not change; and (c) Plaintiff was to report to his new physical location on August 20, 2018.

27. Plaintiff **was very happy** to be transferred by Defendants, felt his concerns were **finally** being addressed, and welcomed a new non-discriminatory and non-hostile work environment).

28. Plaintiff worked in the new location for only less than a week; and while working in this new location, Plaintiff had no problems, no complaints, and expected his prior concerns to be alleviated on a going forward basis.

29. But as discussed *infra*, right after being transferred and despite Plaintiff having no further concerns, he was then blindsided with a termination on August 24, 2018 wherein Defendants expressly told him that his prior concerns were deemed unsubstantiated. Defendants informed Plaintiff ***because of his allegations*** (**all** protected activities by state and federal law) were not able to be substantiated (as to the concerns he raised within his prior location), he was being terminated. Defendants thus ***admitted*** to terminating Plaintiff directly because of his protected activities, both verbally and in writing.

### (D) Plaintiff received a termination letter dated August 24, 2019 *despite having been transferred without further problems* because Defendants perceived his prior allegations of sexual harassment, amongst other concerns, to be unsubstantiated.

30. By letter dated August 24, 2018, Plaintiff received a letter terminating his employment, and the contents of the letter stated *inter alia*:

> Dear Mr. Krupka,
>
> I write to advise you of the results of our investigations into your comments, as contained in the email complaint sent to Lisa Wahl. We advised you that we were investigating and transferred you to another location to give you a fresh environment.
>
> Our investigation revealed that your allegations were unfounded, credibly denied by other employees and at times, were actually false . . . You falsely reported comments and actions by your coworkers, each of which we investigated. None were substantiated.
>
> False reporting constitutes lying, coupled with your Cool Hand Luke comments, establishes your willful misconduct and lack of professionalism. Accordingly, your employment is terminated effective immediately.

7

31. Plaintiff was terminated by Defendants Barretto, Gabel, and Todorov, and their names were identified in the termination 8/24/18 correspondence provided to Plaintiff.

### (E) Plaintiff engaged in nationally-established and indisputable protected activities.

32. Internal complaints of sexually offensive conduct or sexual harassment were made by Plaintiff on numerous occasions in the days, weeks, and month leading up to his termination. These are indisputably protected activities by state and federal law(s).[1]

33. Disclosing health conditions and taking a medical leave of absence are indisputably protected activities under state and federal law(s).[2]

34. Plaintiff's offensive comments reported about his religion / race and towards Jews was indisputably protected activity under state and federal law(s).[3]

35. These are merely examples of the protected activities are not intended to be an exhaustive list, as it is further well established that a plaintiff who engaged in protected activities and complained about harassment or retaliation on account of such protected activities has also engaged in "protected activities" by complaining of unlawful retaliatory harassment.[4]

---

[1] *See e.g. Garcia v. College of Staten Island*, 2015 U.S. Dist. LEXIS 193780 * 25 (E.D.N.Y. 2015) (easily concluding that an employee engaged in "protected activity," and explaining "making complaints to management" is legally protected), citing, *Matima v. Celli*, 228 F.3d 68, 78-79 (2d Cir. 2000) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

[2] It is well established that taking a medical leave of absence is a "protected activity." *See e.g. Guinup v. Petr-All Petroleum Corp.*, 786 F. Supp. 2d 501, 514 ("taking medical leave is a protected activity"); *Bernadotte v. New York Hosp. Med. Ctr. of Queens*, 2014 U.S. Dist. LEXIS 26115 * 26 (E.D.N.Y. 2014) (a plaintiff with diabetes engages in state and federally protected activity by taking a medical leave of absence, also a recognized form of accommodation).

[3] *See e.g., Nidzon v. Konica Minolta Bus. Solutions, USA, Inc.*, 752 F. Supp. 2d 336, 353 (S.D.N.Y. 2010) (the plaintiff's internal complaint to his management about an offensive comment towards Jews was protected activity under state and federal law(s)).

[4] *Figueroa v. KK Sub II, LLC*, 289 F. Supp. 3d 426 ** 18-19 (W.D.N.Y. 2018) (expressing concerns about retaliatory harassment or a hostile work environment following prior protected activities is also protected activity).

### (F) Defendants have already conceded in writing and to government agencies that they terminated Plaintiff because of his protected activities, and Defendants are deemed to have engaged in retaliation *as a matter of law*.

36. Defendants memorialized in their 8/24/18 termination letter to Plaintiff that Plaintiff was terminated for the very complaints he made that were legally protected, including specifying the sexual harassment concerns he made in the "email complaint sent to Lisa Wahl."

37. Defendants again, through their legal counsel, memorialized that Plaintiff was terminated because his allegations (of protected activities) were deemed unsubstantiated by Defendants or lacking in credibility. This was in Defendants' Position Statement filed with the New York Division of Human Rights, which is clearly admissible as a legal admission by Defendants.[5]

38. Plaintiff was directly terminated for engaging in protected activities, as already legally admitted by Defendants (constituting *per se* retaliation).[6]

39. Defendants have alluded in their termination letter and Position Statement to the New York Human Rights Division that they were within their right to terminate Plaintiff because *they disbelieved Plaintiff's protected complaints or thought they may have been false*. If this *per se unlawful approach* by Defendants were to be accepted, plaintiffs complaining about sexual harassment or discrimination all over the United States could be instantly terminated because they

---

[5] *See e.g. Reaves v. Pa. State Police*, 2013 U.S. Dist. LEXIS 137948, *7 (M.D.Pa. 2013) (outlining that it is well established in Circuits that Position Statements of employers to agencies investigating discrimination are admissible as admissions of a party in any litigation or for impeachment).

[6] *See e.g. Medlock v. Ortho Biotech*, 164 F.3d 545, 550-551 (10th Cir. 1999) (affirming jury verdict and explaining that termination letter by defendant to the plaintiff relied upon a reference to plaintiff's prior complaints of racial discrimination, constituting direct evidence of retaliation, regardless of Defendant's panoply of arguments that the plaintiff allegedly acted erratically); *McDonald v. Mt. Perry Foods, Inc.*, 2011 U.S. Dist. LEXIS 84598 * 44 (S.D. Oh. 2011) (termination letter to the plaintiff relied upon his medical concerns expressed warranting automatic denial of summary judgment as direct evidence of discrimination or retaliation).

***could not prove their allegations beyond a reasonable doubt and would be forever chilled in raising legally-protected concerns.*** Defendants have thus admitted to unlawful retaliation.[7]

> **(G) After receipt of evidence by and before the New York Human Rights Division, the state-wide agency determined there was "PROBABLE CAUSE" to believe that Defendants engaged in unlawful retaliation towards Plaintiff.**

40. Reiterating the exact same principles in the nearly identical case of *Calhoun v. EPS Corp.* (*see* footnote 7 *supra*), the New York Division of Human Rights concluded there was probable cause of retaliation in a 12-page reasoned opinion:[8]

---

[7] In *Calhoun v. EPS Corp.*, 36 F. Supp. 3d 1344, 1360-1362 (N.D. Ga. 2014), the Court addressed nearly an identical set of facts as herein and granted summary judgment ***to Plaintiff*** as a matter of law and explained in detail that **any such attempted legal position by Defendant is *per se* illegal** stating:

> Calhoun engaged in protected participation when she filed the EEO complaint regardless of its veracity or merit. By stating that it terminated her because she filed what it believed to be a false complaint, EPS has admitted to retaliating against Calhoun for engaging in protected activity. EPS may have believed that it could terminate Calhoun for filing a false complaint, and it may have believed that Calhoun's complaint was false because she filed it with the Army, **but it was wrong on both counts. This is direct evidence of retaliation**.
>
> \* \* \*
>
> But this is not the usual case. EPS has adduced no competing evidence; it sticks to its guns. It has suggested no nonretaliatory reason for terminating Calhoun. It repeats, over and over, that it terminated her because she filed what it considered to be a false EEO complaint. As explained, **that is not a nonretaliatory reason**: filing an EEO complaint—even one that EPS considered to be false—is protected activity.
>
> \* \* \*
>
> EPS obliquely argues that it terminated Calhoun because she violated its policy against submitting false reports to the government. In general, violation of a company policy provides a nonretaliatory reason for termination. *See Kragor*, 702 F.3d at 1309. But Calhoun's alleged violation of the policy and her protected activity were one in the same: filing the complaint with the Army EEO office. EPS's reason is not nonretaliatory.

[8] It is well established that administrative findings are admissible at trial. In *Strauss v. Microsoft Corp.*, 1995 U.S. Dist. LEXIS 7433 \* 7 (S.D.N.Y. 1995), the Court explained:

> The Supreme Court has held that prior administrative findings made with respect to an employment discrimination claim are admissible under the exception to the hearsay rule pertaining to public records and investigatory files. *Chandler v. Roudebush*, 425 U.S. 840, 863 n.39, 48 L. Ed. 2d 416, 96 S. Ct. 1949 (1976); Fed. R. Evid. 803(8)(C). Specifically, Rule 803(8)(C) applies "unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8)(C). As Strauss offers no evidence that the EEOC determination is untrustworthy, the Court finds that the EEOC finding is admissible under Rule 803(8)(C).

[Defendants] state that [Plaintiff] was not terminated simply for making discrimination complaints but rather because the complaints were concluded to be unfounded and "falsely reported." **However, the inability to substantiate an individual's discrimination complaints does not in itself justify an employer's action in retaliating against the employee who complained**.

41. In sum, Defendants have already admitted in writing to Plaintiff, to a state agency, and publicly to illegally retaliating against Plaintiff. Defendants have conceded liability because it is – point blank – impermissible to terminate an employee just because an employer doesn't like allegations or thinks the employee lacks sufficient proof of allegations.[9]

42. Moreover, Plaintiff had no disciplinary history until complaining of protected (statutory) concerns and being promptly terminated.

43. Not only have Defendants admitted to unlawful termination towards an employee with no disciplinary history, they promptly terminated Plaintiff while he had already been transferred wherein there was no existing concerns.

### (H) **Defendants attempted to fabricate a knowing false defense to the New York Human Rights Division based upon Plaintiff supposedly having union rights.**

44. For Plaintiff's first 189 days of employment (from 2/12/18 – 8/19/19), Plaintiff worked at a location for Defendants that was non-union.

45. Plaintiff was transferred to a new location following legally-protected complaints on August 20, 2019, *working for 3 days* before being terminated on August 24, 2019 by his same management wherein he was employed for the first 189 days.

---

[9] The overwhelming majority of employees who complain about discrimination in a workplace do so on assumptions, speculative views, and feelings. No typical employee has iron-clad proof of discrimination, and virtually every alleged discriminatory in a workplace downplays or denies employee concerns. Defendants have conclusively elected a defense that is not legally tenable or viable and which is patently rejected across the United States.

11

46. Defendants had the utter gall to claim in correspondence and legal filings in the midst of state-agency proceedings against Defendants that Plaintiff was not allowed to sue for any type of discrimination or retaliation because he was a union employee subject to a collective bargaining agreement. This is also memorialized multiple times as a (false) defense in Defendants' Position Statement to the New York Human Rights Division. But:

   (a) Defendants already intended to terminate Plaintiff before transferring him to a union location;

   (b) Defendants only attempted to transfer Plaintiff to concoct a technical defense that is non-existent;

   (c) Even if Plaintiff were part of a union, that would not prevent Plaintiff from proceeding under state and federal anti-discrimination or anti-retaliation laws (as they do not supersede ant-discrimination protections or venues); and

   (d) Plaintiff **never** became a part of a union in August 2018, as: (1) he was not provided with any union documentation; (2) never paid a union due; (3) would have had to be employed for a threshold period of time to even be considered for position union admission; (4) would have had to consent to same; and (5) was offered no union recourse post-termination as he was in all respects **never** once deemed part of a union.

47. Defendants have orchestrated Plaintiff's false termination and they had the gall to terminate Plaintiff for lack of proof of his underlying legally-protected concerns, which is *per se* unlawful. All Defendants herein are liable individually and/or collectively for the aforesaid unlawful actions towards Plaintiff.

### Count I
### Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")
**[1] Retaliation; [2] Hostile Work Environment**
**- Against Defendant Cornerstone Only -**

48. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

49. Plaintiff was subject to two separate adverse actions: (1) a hostile work environment and retaliatory hostile work environment; and (2) a termination.

50. These adverse actions taken against Plaintiff on account of his sex and/or complaints of sexual harassment constitute violations of Title VII.

## Count II
### Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")
### Retaliation for race / religious concerns
### - Against Defendant Cornerstone Only -

51. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

52. Plaintiff was subject to two separate adverse actions: (1) a hostile work environment and retaliatory hostile work environment; and (2) a termination.

53. Plaintiff is a Jewish male. Being Jewish is a religion, ethnicity, and race (as a matter of law).[10]

54. These adverse actions taken against Plaintiff on account of his race and/or religious complaints of discrimination constitute violations of Title VII.

## Count III
### Violations of 42 U.S.C. § 1981
### Retaliation for racial / ancestral concerns
### - Against All Defendants -

55. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

56. Plaintiff was subject to two separate adverse actions: (1) a hostile work environment and retaliatory hostile work environment; and (2) a termination.

---

[10] Further explanation that Judaism constitutes a race and ethnicity (in addition to a religion), is provided in Plaintiff's Count under 42 U.S.C. § 1981 (Count III).

57. The specific race and ethnicity of Plaintiff includes being Jewish.[11]

58. These adverse actions taken against Plaintiff on account of his complaints of discrimination constitute violations of 42 U.S.C. § 1981.

### Count IV
### Violations of the Americans with Disabilities Act ("ADA")
### [1] Discrimination; [2] Retaliation; and [3] Hostile Work Environment
### - Against Defendant Cornerstone Only -

59. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

60. Plaintiff suffered the foregoing referenced adverse actions because: (a) of his actual or perceived health problems; (b) his requested accommodation(s), time off from work; and (c) for expressing opposition to harassment on account of his protected activities.

61. These actions as aforesaid constitute violations of the ADA.

### Count V
### Violations of the New York State Human Rights Law ("HRL")
### [1] Retaliation; [2] Discrimination; and [3] Hostile Work Environment
### - Against All Defendants -

62. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

---

[11] *See e.g. Smith v. Specialty Pool Contractors*, 2008 WL 4410163, at *4 (W.D.Pa. 2008) (in accordance with Supreme Court jurisprudence, "persons of Jewish ancestry are a distinct race and, therefore, within the protection of 42 U.S.C. § 1981," citing, *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 611-13 (1987))." *See also Isakov v. HASC Ctr., Inc.*, 2018 U.S. Dist. LEXIS 31624 * 13 (E.D.N.Y. 2018) (the Second Circuit has already concluded that being Jewish is a race under Supreme Court jurisprudence).

63. Plaintiff incorporates all prior Counts into claims asserted under the HRL herein, as the HRL is a single state statute prohibiting all actions taken against Plaintiff as set forth in this Complaint and each prior Count.

64. The retaliation, hostile work environment, and termination Plaintiff experienced because of his racial, religious, sexual harassment, and medical matters / complaints all constitute violations of the HRL.

### Count VI
### Violations of the New York City Human Rights Law ("NYCHRL")
### [1] Retaliation; [2] Discrimination; and [3] Hostile Work Environment
### - Against All Defendants –

65. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

66. Plaintiff incorporates all prior Counts into claims asserted under the NYCHRL herein, as the NYCHRL is a single city statute prohibiting all actions taken against Plaintiff as set forth in this Complaint and each prior Count.

67. The retaliation, hostile work environment, and termination Plaintiff experienced because of his racial, religious, sexual harassment, and medical matters / complaints all constitute violations of the NYCHRL

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

B. Plaintiff is to be awarded liquidated, punitive damages or other penalty-related damages, as permitted by applicable laws, in an amount believed by the Court or trier of fact to be

appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

  C. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

  D. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

  E. Plaintiff is to receive a trial by jury as requested in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: */s/ Adam C. Lease*
   Adam C. Lease, Esq.
   3331 Street Road
   Two Greenwood Square
   Suite 128
   Bensalem, PA 19020
   (215) 639-0801

Dated: December 18, 2019